May it please the court. Good afternoon, your honors. Again, my name is Ethan Balow and I'm still speaking for Kelechi Ajoku. Your honor summoned us back here today to address three questions. You've solved one of them by giving us an invitation to meet with you and I thank you for the opportunity. The second question I would be inclined to address briefly unless you would have an extended discussion. Mr. Ajoku's contention is rather direct. That SAFCO succeeds Titoian. It's irreconcilable with Titoian and this court's cash smuggling case law, false statements case law. This court should apply Miller v. Gammy, find that Titoian carrier Hirsch, that line of cases has been effectively overruled by Brian Dixon and SAFCO and should say willfully, define willfully pursue it to Brian. Okay, so I have a question about that. Okay. What, so how can you say that Brian effectively overruled those cases? Did it come after those cases? It didn't, but the last Supreme Court pronouncement is SAFCO, which is June of 2007, about six months after Titoian. And so SAFCO handled the matter as settled law. And it said, we have consistently held, citing both Dixon in the 2006 case and Brian in the 1998 case, that in a federal criminal statute, when Congress uses the word willfully, it means one of two things. At a bare minimum in a criminal case, it means the defendant acted with knowledge of unlawfulness or with bad intent. And those are interchangeable. It also held out a more serious showing of willfully where there's a specific statute or a highly regulated area where the defendant would have to know the specific statute and that's sort of the tax statutes and that would be United States v. Chief and cases like that. So I agree with you that that's the law, but we're here on a Section 1035 case. Yes. So why would we overrule cases under Section 1001? Oh, I don't think you have to. I think that's what I've asked you to do. I think on 1035, it's a matter of first impression. Right. You could interpret 1035 with 1347. That's the Awad case. They were both enacted two sections apart as part of HIPAA in 1996. They both had the same mens rea, willfully and knowingly, and Awad is established in this district, in this circuit, as willfully as we interpret it, the Brian standard. And Congress, when they enacted HIPAA, certainly had one mens rea for willfully, so I don't think the Court has to go as far as I've asked it to. But to the extent it felt it was bound by the twin, I think the Safeco Avenue is the way to get around that. Your argument is directed at the notion, as to a certain extent, the government's, as to whether this panel can overrule that line of cases or whether we'd have to kick it up to an in-bank court. Right. And I think our position in our briefs is you don't have to do it because 1035's first impression and the impar materia statutory canon gives enough coverage to apply Awad as controlling law. But to the extent there was a concern about that, Safeco comes after does address the issue as settled law. It is, has effectively overruled Hoyer and Titoyen, but it's not necessary for this panel. But I think there's both, you can go either way, and there's ample power with you three judges to rule in our favor on the willfully question. Okay, so assume we were to rule in your favor, didn't say that the jury instruction was wrong. Right. Was that harmless error? I don't think so, Your Honor. Neither teaches us that the standard for harmless error is, it has to, it's typically when it's, what it says is when it's an uncontested element and the evidence of that element is overwhelming. And here it was both contested and it wasn't overwhelming evidence. And I, and I sort of raised three sort of instructions. Instruction have to tell the jury one that would be compliant with the view of the law that you've just expressed. Yes. But it had to have told the jury that your client knew he was violating a specific statute? We haven't raised that argument and I don't think so in this case. I think they would have to say he knew that it was, his conduct was unlawful and he did it with bad intent, with an intent to violate the law. But he did admit at trial to filling out these forms, right? He did. With containing false information. Oh, I wouldn't say that, Your Honor. Pardon me. What he said was he filled out the forms and some of the forms, he filled out one page of the application. They never gave him the certain pages. A letter was written to him that was never provided to him. But let me go back to my three broader points so I can get into specifics of the trial evidence. One, his defense was, writ large, as presented by counsel, was he was a 20-year-old duke. He was a fool. And he was a perfect pawn for this group to use as an exemptee. And the government cooperators largely corroborated that. And he told him, at least the one contained in count one, told him that he was signing it under penalty of perjury. Can I get there in a minute, Your Honor? I'm definitely going to address that question because that's the opinion you wrote and that's one of the keys to my argument. But I'd like to, if I may, put a little context on why it's not harmless and I'll address it directly. Sure. Thank you, Your Honor. So that was his large defense. He was a fool. He was a perfect pawn. The cooperators said they never knew about the billing fraud. He didn't know it. So how do we evaluate this? One, under Sullivan v. Louisiana, the question is not whether Your Honors think a jury would have convicted him. The question is whether this jury in this case would have convicted him. And the jury saw his credibility and they were able to assess was he the fool he claimed or not. And I don't think as a broad level, before I get to specific counts, anyone on this bench can say this jury would have found him incredible, would have rejected it. There's no basis for that. And Sullivan v. Louisiana is very clear that when we get to a place of judicial fact-finding, that does violence to the 14th Amendment right to a jury verdict. And this jury could have and would have assessed him. The second point I would make is, it's related, is this jury's assessing Kolechia Juca, which what did he intend? I'm going to get to his penalty of perjury in a moment. So it's not the reasonable person's standard. You're not evaluating whether on these facts your law clerk or this lawyer or someone on the bench would have known better or would have done better. The question is, who is Kolechia Juca? Who was he presented to the jury? And did he know better and have evil intent? Did he know he was violating the law? And the third piece, which I think is also important, as Your Honor will recollect when you authored the opinion, the knowing element was either because it was shown he knew he was made a falsehood or he was deliberately ignorant, which is he knew he wasn't exempt and never found out the truth. I think the opinion said regarding counts two and four that he knew he didn't know they were, he knew he didn't deliver them and he never asked them. Actually, I would respectfully suggest that's actually not the evidence. On Clerk's Record 435 of 238, his testimony was, Josh Gonzalez told me they delivered these things and that's why I filled out the certifications because he told me they were delivered. So it's akin to when I sign a proof of service saying I caused a brief to be filed in this court. I caused them by sending an email. But I certify that to this court every time and I'm not making a knowing false statement. I'm not making anything close to a false statement. So that's what the certification is about. So I want to go back to the nub of the matter, the penalty of perjury. To find out, to believe that that's harmless beyond a reasonable doubt, you would have to accept his testimony and say a jury would have necessarily found that statement was both knowingly false and willfully false. The first application is just an application. Now, was the government's proof some of the stuff they submitted without his knowledge? He said all of the things in there he had never seen before. He was shown page after page. I didn't see this. So maybe it was a backdated contract. Well, the contract did have a false date. He admitted that I wasn't starting on this date. But he also explained to the jury that no, I didn't think it was a big deal. This was a contract my employer gave me. I didn't think I was violating the contract. Perhaps it was the affidavit, which he admitted he signed. He testified, no, no, I didn't even read the whole thing. I was focused on the language of the oxygen. I didn't know it was going to be submitted. So yeah, no, it's true that I wasn't, all of this isn't true, but I didn't know it was going to be submitted and I didn't do it with bad intent. I thought it was an internal document. These, how can this panel on this record say which of the, there was 11 options they gave this jury for false statements, that one you have to figure out which one they necessarily found, rejected his testimony. And then you have to find they necessarily rejected his testimony of, I didn't do it with bad intent. And I don't think that's possible. One thing I want to clarify. How can you not have bad intent when you say I was going to be, the form says I was there regularly. I was not, that I was a full-time employee. I was not, that I. Let me finish. Watch these syringes to make sure they were properly applied, that I instructed patients, all of which was not true. Okay. Your Honor, just made several statements, some of which he's not accused of. They're not counts. So I don't know whether he said them or not, but I think your recitation of the record, Your Honor, with great respect, isn't the statements he made. But I'll give you the first one you made. There was a, for the application, there was a list of the So you have to find that the jury rejected that testimony. There's no basis to do that. He denied doing that. For the, how can you do it with bad intent was your broad question, Your Honor. Exactly how? The employer said I need to sign this employment application. It's internal for the company. It means they're going to pay me. I don't know what's going to the government. I'm telling, I don't think there's anything wrong with this. Is there any evidence that he did know that it was going to the government? Certain things, yes. There was a conflict in testimony with he and Josh Gonzalez disagreed about a number of things. And he testified contrary to Mr. Gonzalez. And that's when you go back to Nieder's test, which is, it has to be uncontested with over, I think we've lost Judge Goodwin. Should I stop you, Your Honor? I think we have, yes. Let's just stop and try to get back on the line. Hello. Hello. Hello. Okay. You're, you're back on with us Judge Goodwin? Yeah, it, I don't know. It broke up for a minute. Okay. But I can hear you. Okay. So now, now we can keep going. Okay. Thank you. Good to see you again, Your Honor. Uh, what I wanted to say one is an important note. In footnote four of the government's brief, they said there had to, there doesn't have to be unanimity on the jury about which fact he covered up or falsified. And that's inaccurate. Jury instruction 17 required unanimity as to the fact that Mr. Ojukwu concealed or falsified. So we have to be able to identify that first. And I'm saying on this record, that's not possible. Under Sullivan, we have to, the instructions control. When you say, how can that be false? When he had this application, which he explained, this is what I was going to be doing in the future tense, which made sense because it was an application to get the exemption. How could he be doing it in real time? If it was an application that was illegal until he got the license. Notably, the DPH officer, the investigator that worked Robin Perry, interpreted the application the same way that they use the present tense, but she interpreted as, no, this means that this is what they'll be doing if they get the exemptee license. So to answer your, to answer your question, I would say, yes, the trial could be done with bad intent. An individual could think that signing this for their employer isn't unlawful, that it's ministerial, it's idiosyncratic bookkeeping. And the jury could have credited that and still convicted him. And that's why he gets a jury trial. Again, that's why he gets a second chance. The same thing for counts two to four, Your Honor. One, putting aside the challenge we had, I don't see that he certifies he's the one that delivered them. If you look at the forms, they're not under penalty of perjury. They look pretty, they look like the internal form. They were created internally. It's a Santos form. And the person he's sitting next to says, we delivered these, and these are accurate, but we want you to sign them. And he did. And then when he signed exempt, he said, don't do that. Just sign that they were trained. I trained them. And that's what he testified to. And so a jury very easily could have credited his testimony, believed he was a 22-year-old foolish child, but that he was deliberately ignorant, he didn't learn the truth, and he was guilty of making false statements. But that doesn't mean he did it with bad intent. And that's the decision that a jury gets to decide. I guess I'll close. I'm going to try to save the rest of my time for rebuttal. Just one question. The sentence to 13 months, so is he out now? He has not gone in. Oh, he has not gone in. He's been out on bail the entire time. When we made a motion to stay the mandate, it was denied. We didn't know how to interpret it. The governor and I agreed that we'd file a cert petition, either it would be denied quickly and he would go in and this case would be over, or if it wasn't denied quickly, it was because his case had merit and it would be appropriate to let him out until this case was ultimately decided. They have obviously gone through the civil forfeiture proceedings and he's lost his license to be a nurse, so the collateral consequences weigh upon him daily. But he's not served a custodial sentence yet. I'll reserve my time. All right. Thank you, counsel. Good afternoon. John Claude Andre on behalf of the United States. I'll begin where the Court would like me to start elsewhere, and that is whether this three-judge panel has the power, and I guess alternatively, if the three-judge panel does have the power, whether it should address the 1035 willfulness question in this case. Certainly, this panel ---- We're going to address the 1035 question. You're saying whether we should address the 1001 question? Yes, Your Honor. Basically, whether the Court needs to go en banc to resolve the 1035 question, which there's two ways to handle it. One way is to do it narrowly, and the other is to do it more broadly. And I guess it all turns on what the Court decides is the best way to dispose of this case and what kind of decision the Court wants to write. We're not here suggesting that the Court has to go big. The Court could write a narrow decision adopting the government's concession as to 1035 and being expressed that the Court is addressing 1035 alone and then proceeding to the harmless error analysis. However, in our view, if the Court wanted to be more, for lack of better terms, full-throated in its explication as to why the Court was having even perhaps a temporary disconnect between the interpretations of 1001 and 1035, then the en banc court's intervention would be necessary. And that's because I don't think anyone in this room would disagree that 1001 and 1035 should be interpreted the same way. And I know that Mr. Ballo has his arguments as to how there isn't a, or there's a Miller v. Gammie exception in this case. We disagree with those arguments, and I'll walk the Court through them. First, SAFCO is, Mr. Ballo is correct, temporarily an intervening case post-Titoyen that would seemingly allow the Court to, or even this three-judge panel, to rewrite on not just 1035, write in the first instance on 1035, but also rewrite on 1001. But we disagree with that for a number of reasons. First, SAFCO, it was dicta. I mean, it was clearly dicta. It was a civil, a fair credit reporting act case. It was a footnote. Even with all due respect to a former Justice Souter, it was wrong. He said that the Court has consistently applied Brian Willfulness to false statement provisions. And, of course, Browder, the 1941 case that developed the definition that was applied by this panel previously, in this particular case here, Browder, the Court didn't apply Brian Willfulness. The Court applied a more relaxed standard, and that was a false statement to get a passport case. Additionally, this Court has applied Titoyen post-SAFCO. It did it in Del Toro Barraza, which was the bulk cash smuggling case. And, moreover, if you were to even take the SAFCO dicta footnote at its literal terms, that the Supreme Court has consistently applied Brian Willfulness to criminal statutes, that would cause a whole host of other circuit precedent problems because this Court, at least in the 15 U.S.C. 78 FFA securities fraud false statement context, has continuously applied a willfulness definition that is less demanding than Brian and has done so post-SAFCO, post-Titoyen. I'm talking about cases like Reyes, cases like Bailey. And the Second Circuit also agrees with Reyes and Bailey. There's a case called Kaiser that's cited in the cert briefs in this case. Is it a fair description of the — I guess it was the Solicitor General that decided to confess error? Yes. Is it a fair description of that to say that they thought there was a problem in importing the analysis of 1001 into 1035? On willfulness. That there was a problem with it? Yeah. That we could not do that because of Brian. Yes and no. I'm sorry. That's not a very satisfying answer. I think — Can I just answer it the best way you can? The best way I can is when the government files a brief in opposition to a cert petition, you know, a lot of people put their heads together and ultimately the Solicitor General makes a call as to what the government's official interpretive position as to an issue should be. And until the SG says something different, that is the government's position and it's supposed to bind all of us who are below and even well below the SG's ranks in my case. And so in that evaluative process as to how to interpret 1035, all of us in the government, all the way up to the Solicitor General, agreed with this panel that 1001 and 1035 need to be But then we also determined that the existing interpretation of 1001 was incorrect and that the Third Circuit's definition or interpretation of willfulness under 1001 in Starnes is the correct interpretation. And so because we had two cases going up and we wanted to explain to the Supreme Court, you know, exactly how the issue came up in both this case of Joku and the Russell case out of the First Circuit, why we thought it was wrong and, you know, what the remedy should be, we laid it all out and explained that we thought that both 1001 and 1035 were wrong. To me, like, and correct me if you're wrong, that you're arguing that we can't just isolate on 1035 because the whole kit and caboodle of cases that involve 1001 and 1035 run afoul basically of Brian? That is what we put in our, yes, I mean, yes insofar as that's what we put in our letter brief and that's what I think, again, if this Court wanted to really write on how 1035 should be interpreted, the only way that this Court could really write a fulsome opinion would be to have the en banc court write that opinion because otherwise you would run right into the 1001 precedent. So you're saying we don't have, because all we have is the confession of error, we don't have an intervening decision that would come within the meaning of Miller v. Gammie? That is absolutely correct, Judge Ward. Okay, and did the Supreme Court DVR the Third Circuit case, too, on that same grounds? The First Circuit case, Russell? The First Circuit, yeah. It did. And so what has the First Circuit done? The First Circuit, for reasons unknown to me, the government in that case did not suggest that the Court go en banc. There was supplemental briefing ordered by that panel. There was an oral argument, and there is an unpublished, not even mem dispo-ish order that you can't find on Westlaw or Lexis, but you'd have to go into ECF to find, that affirmed two counts of conviction as harmless because, as in this case, there were forms that had a disclaimer, under penalty of perjury and so on and so forth. We'll deal with that some more in a few minutes. And then vacated two counts of conviction. So, I mean, I'll confess to you. They certainly didn't agree with you that they ought to go en banc. They, the government didn't ask them to go en banc in that case, whereas the government has. And that determination. What I don't understand is you all end up reporting to the same person. Can't you all get on the same page? We do our best, Your Honor. And, in fact, in this case, we came along second. The First Circuit moved, and I know this panel moved extremely quickly in issuing a supplemental briefing order, and then we took a number of extensions. The First Circuit moved like a rocket docket. Within a matter of weeks, everything was teed up and ready to go, and perhaps just because it's a smaller circuit. So the more, the evaluative process in this case came afterwards, and that's when the government decided that this issue in circuits where there was existing controlling 1001 law should go to the en banc court. And that determination was not made in that other case. Let's assume that we agree with counsel for the appellant, that this panel can do what the error confession suggests, that we don't need to make a sui spontaneam banc call. What's your position on whether the error was harmless? Our position is that the error was absolutely harmless in this case. I have a question for you on that. This is what's telling you. This case, I mean, it's been up and down. It's been going on a long time. We were kind of looking at this evidence and trying now to put it in a different framework. Because the district court used the incorrect instruction, neither side had the opportunity to argue the second prong, right? Correct. And the facts to the jury. So what you're doing now is arguing it to us for the first time. And what we don't get to see is the credibility of the witnesses, the fact that the four possibly more culpable defendants all pled guilty and gave evidence against this guy who was his third job. And so I'm having a hard time just going, well, it's harmless, because we can look at that evidence and that evidence and that evidence. But we don't have the people in front of us to make any assessments of their credibility and whether their stories hold true at all. And we don't even know. There's some questions. I mean, I read the record. I think, well, what did they say in response to that question? And that question wasn't asked because the judge had said, we're not going to instruct that way. So, I mean, I don't know how you can say all this is harmless, because we're just sort of trying to take evidence that came in under a different framework and put it into a new framework that the jury didn't have. Well, Judge Warlock, appellate courts are charged all the time with making harmlessness determinations, whether you're in the direct appeal context or the habeas context, and the standards were set to reflect that. Well, I certainly understand that, Mr. Andre. But it's sort of my point. And being an appellate court judge, I get it. I'm sorry. Of course. My point was that I understand that it's an unenviable task to look at the cold record, but it's not even that. I'm not asking for sympathy. I am saying the jury had one rubric. They had one set of arguments. They had testimony enlisted under one framework. And there are things that, you know, I want to know the answers to, and they're not in the record. Right. And there's arguments that should have been made that weren't made. And that's a different kind of situation on most harmless error questions. No, absolutely. And that is one reason why, in conducting this harmlessness analysis, we're not conducting the same analysis as we do for sufficiency, that the government doesn't get the benefit of Jackson. We get that, too. We know that harmless error standard is not the same as sufficiency. But nonetheless, the Court can still look at the evidence that came in, look at the facts, and particularly the documentary evidence, the explanations as to what the documents say, and determine if the jury had been correctly instructed, would they have convicted beyond a reasonable doubt. And the answer here is yes, because there was overwhelming evidence that defendant knew that his conduct was unlawful. In particular, we have defendant understood, he admitted on cross that it was, that he'd be truthful with the government, the government would rely on his representations. He admitted it was wrong to submit false statements to the government. He knew that there was, that the law required Santos to have an exemptee. And he knew that he was not expected to do the exemptee's job. And then that alone, under this Court's harmless error precedent, in particular, Barry, from a couple years ago, where this Court found the error harmless when the defendant was notified of his obligations, that should be enough. But there's more. There are, of course, the two documents that the defendant signed. And it doesn't matter whether he was shown the instructions or not, because right above his signature, he signs and acknowledges that the forms are being submitted under penalty of perjury. And that's Government's Exhibit 137, excerpt page 1194. Government's Exhibit 139, which is the renewal application from two years later, Government's Excerpt 1162. And so he knew that everything he had to say there was true. But critically also, in that very statement and warning that he signed, it said any subsequent submissions to us also have to be truthful. And did Mr. Jofu ever admit in his testimony that at the time he signed these documents, he knew these statements were not true? I mean, that's what your opponent pointed out, that some of these things turned out not to be true. Working full-time, dispensing advice on syringes, et cetera, et cetera. I would say I don't know for certain. Well, no, he admitted that the employment contract was backdated. And so I don't know for certain. And so the employment contract was sent in as a supplement months after he initially applied to be an exemptee and was backdated to a date that was three months before he actually started work there. Other than that? Other than that. Is there proof in the record that any of the statements that he made, he knew they were false when he made them? I mean, I recall some things from the record where he was asked about something I think as a response to something like, well, they didn't ask me to do that. Right. They never asked me to do that. They never asked me to look at prescriptions. They never asked me to look at syringes. I don't know for certain whether he admitted that certain false statements in, I guess, in particular in Count I were untruthful beyond, again, the fact that he's admitted that the employment contract was backdated. Wait a second. You're not giving a straight answer to Judge Hawkins' question. You're saying you don't know the answer to the question? I don't know for certain, no, Your Honor. But I guess what I would like to do is back up and reject the premise, if I could, which is that the government in this case had to prove a material scheme to defraud Medicare and that the defendant willfully participated in that scheme. The one fact that the scheme was designed to cover up as charged in the indictment was that Santos Medical Supply maintained and distributed syringes outside of his presence and control. And so the various six additional statements that are listed in Count I are just examples of evidence that support the scheme. Well, was he convicted of false statements? He wasn't convicted of conspiracy, was he, or a scheme, was he? Count I was a scheme offense, and then Counts II through IV were individual false statement charges. I thought that he was convicted for four charges of false statements. Your Honor, they all were under 1035. The first charge was under 1035A1, which is a to conceal a material fact with a scheme, device, or trick. And then Count II is to actually make, you know, material false statements, affirmative false statements. Now, of course, you know, what is one person's false statement may be another person's  And so, you know, in the indictment in this case, we have charged everything that you would see in the indictment in this case, or in the trial indictment in this case, as part of one count. Prosecutors like to have more robust tools when they go into trial. We broke them out into, you know, a scheme count that dealt with the syringe issue and then the individual false statement counts relating to the wheelchairs. And on the syringe issue, the evidence, we don't have to really talk, about whether the defendant knowingly made false statements or knowingly participated in the scheme. We do have the jury's verdict as to that. The only remaining question is whether the defendant did these things knowing that it was unlawful to do so, and that is why we thought it was, this is an easy case as to harmlessness, that the forms told him it was unlawful to lie to the government in connection with this program, in addition to all the other general admissions he made on the cross about wrongfulness in lying to the government. And so it doesn't matter who said what with respect to count 1A, B, C, D, E, and F. The jury already answered the knowingness question. The question is, do we have evidence that he knew it was unlawful to do, to conceal that Santos maintained and distributed syringes outside of his presence? And would he then know that it was unlawful to fill out these training certifications that were clearly false? The knowledge question has been answered by the jury. This Court found it sufficient previously. And the only question is this, what was his knowledge of the law? And, again, we think on that, the evidence establishes that any error was clearly harmless here. I see I'm over my time. Unless the Court has follow-up questions for me, I'm happy to sit down. Judge Goodwin? Yes. I have no questions. All right. Thank you. Thank you. Thank you very much. Thank you. I'll try to make five points in the time I have left. I have the exhibits. My colleagues write about them. They do tell the case. There's a facile, you can understand the surface appeal of why penalty of perjury, why the government hits that hammer so hard. But the hard work is the fact intensive work. Let's take a look at 137. This is the application. This is page one he signs. What is false on this page? Nothing. Not a word. The government had a theory of why it was false because it says he's going to be an exemptee. So did the jury find that he knowingly lied about being an exemptee? Did they accept his testimony but found he was deliberately deliberate, deliberately ignorant of the knowledge for page one? Or did they credit him and find something else? Page three, he said he never saw. The rest is his diploma. Nothing's inaccurate about these pages. Nothing's inaccurate here. His student transcript. We get to his employment contract. He says, oh, it's right, it's backdated, but he affirmatively denies criminal intent. He says he explains to the jury why he did have bad intent, why he didn't think this was particularly unlawful. But by the government's theory, we take the general, the penalty of perjury, and it ends the analysis and it overrides his testimony. He just told you it doesn't matter what he said. I disagree. I think Mr. Ojukwu's testimony mattered. The jury was entitled to make that decision. The same for the affidavit. For governments, the renewals say nothing. They're just like the first page. They're not even filled out. They have no representation on them. I think because of that, the penalty of perjury is not enough. You have to find – you can't even say they – what Mr. Andre just said is the jury answered a knowledge question. No, they didn't. They answered a knowledge or deliberate ignorance question, and now we're going to try to have a third mens rea imported by a bench when the jury didn't have a chance. In Garcia's Ulibarri, this court said, you can only have harmless error on a neater standard when the element is uncontested and the evidence of intent is overwhelming. Here, it was contested and it was not overwhelming. I'll make one last point before I sit down, if I may. There's no doubt that Kelechi Ojukwu was a foolish young man. He was definitely foolish enough to turn down a federal misdemeanor, which you don't do. He was foolish enough – Did what? He turned down the federal misdemeanor. That's what the record is. They offered him to get rid of this case. He was silly enough to go to trial. He was a foolish young boy who's been convicted. His trial was infected by an error. He should have a second chance for a jury to hear his case. He should have a second chance for him to rethink his case. But on this record, you should not affirm these convictions. He should have a second chance. I'd ask you to give it to us. All right. Thank you very much, counsel. This matter will be submitted and the court will be adjourned for this session.
judges: GOODWIN, HAWKINS, WARDLAW